**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**July 26, 2004**

**Charles R. Fulbruge III**
**Clerk**

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 03-60880
(Summary Calendar)

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

versus

SUPERIOR PROTECTION, INC.,

Respondent.

Petition for Enforcement of Order of
The National Labor Relations Board
(Nos. 16-CA-21399, 21495, and 10361)

Before JOLLY, WIENER, and PICKERING, Circuit Judges.

PER CURIAM:[*]

Petitioner National Labor Relations Board ("NLRB" or "Board") seeks enforcement of its order commanding Respondent Superior Protection, Inc. ("Superior"), its officers, agents, successors and assigns, to cease and desist (1) impliedly threatening employees in writing with discharge or discipline for supporting United Government Security Officers of America and its Local #229 or any other union (collectively, "the Union"), (2) disciplining,

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

discharging or otherwise discriminating against any employee for supporting the Union, (3) disciplining, discharging or otherwise discriminating against employees because they have given testimony under the National Labor Relations Act (the "Act"). The Board also seeks enforcement of its order commanding Superior to reinstate fired employee Kelvin Trotter to his former position, to make him whole for loss of earnings and other benefits pursuant to F.W. Woolworth Co.,[1] less any interim earnings and plus interest as computed in New Horizons for the Retarded,[2] to remove from its files any reference to Trotter's discipline and discharge, to make various employment records available to the Regional Director of the NLRB, and to post at its Houston, Texas facility copies of a notice appended to the order. Finally, the Board seeks enforcement of its order instructing the Regional Director of the NLRB to open and count Trotter's contested ballot, serve a revised tally on the parties, and issue the appropriate certificate. Superior resists the enforcement of the orders or any portion or portions thereof.

We have carefully considered the briefs of counsel for the parties and the record of this case as supplemented, including the extensive, highly detailed analysis of the Administrative Law Judge ("ALJ") of August 28, 2002, as modified September 25, 2002. As a result, we conclude, under the applicable "substantial evidence" standard of review, that the NLRB's order is reasonable, supported by such evidence, and must be enforced in full.

[1] 90 NLRB 289 (1950).

[2] 283 NLRB 1173 (1987).

I.

As the parties are fully conversant and familiar with their respective burdens of proof and persuasion and with the standards applicable to our review of cases under § 8(a)(3) and (4) of the Act,[3] we need not reiterate those standards here. It suffices that when the Board charges an employer with unfair labor practices under these subsections — discharging or otherwise discriminating against an employee because he has given testimony under the Act or discriminating by terminating employment to discourage membership in a labor organization — the general counsel's burden of persuasion is to demonstrate what protected activity of an employee, if any, was a substantial motivating factor in an adverse employment action taken by the employer against that employee. If that burden is met, it becomes incumbent on the employer to demonstrate that (1) it took the action complained of on the basis of unprotected conduct, and (2) it would have taken the same action in the absence of protected conduct. An employer's proffered non-discriminatory reason and a determination that the adverse employment action would have been taken even in the absence of protected activity are nevertheless trumped by a demonstration of pretext. The overarching principle is that reasonable decision of the NLRB must be affirmed if it is supported by substantial evidence, even if we might have reached a contrary conclusion. This is particularly true in cases, such as this, when the decision of the NLRB is grounded in large part on credibility determinations

_____

[3] 29 U.S.C. § 158(a)(3).

of the ALJ who, after all, heard the testimony and observed the demeanor of the witnesses for the opposing parties — here including none other than the employer's President, Jack Heard, and the eventually terminated employee, Kelvin Trotter.

## II.

The purportedly non-discriminatory reasons advanced by Superior for the escalating series of adverse employment actions it took against Trotter, culminating with his firing, are (1) lying under oath during the initial hearing conducted by the ALJ and in subsequent federal and state utterances, (2) disobeying a direct command by a superior (here, Heard, the employer's President) to report for work "on time" immediately following Trotter's testimony at the initial hearing, (3) insubordination in a confrontation with a supervisor, Jose Castillo, and (4) possessing a "dirty" firearm and a total number of cartridges in excess of the maximum allowed. The ALJ concluded, and the NLRB agreed, based on widely divergent positions and explanations advanced by the parties, that the reasons given by Superior were pretextual, that the disciplinary actions taken against Trotter were grounded in anti-union animus, and that the adverse employment actions in question would not have been taken but for that animus. As we agree, we touch only briefly on Superior's proffered non-discriminatory reasons for its actions.

First, Superior's allegations that Trotter lied address almost entirely statements he made at NLRB hearings and to the State Unemployment authorities regarding his transfer by Superior from Galveston to Houston well before commencement of the organizing

4

efforts here at issue. Other than that, the allegations of mendacity address Trotter's reason for requesting time off on the morning of the initial hearing. He told his immediate supervisor that he needed to attend to a personal matter when, in fact, he was responding to the subpoena for the initial hearing before the ALJ.

Superior's claim that Trotter lied about not having applied for a transfer boils down to a quibble over whether he "applied" on several occasions to be transferred from Galveston to Houston or merely informally "requested," or let his preference be known, that he would like to be transferred to Houston. Not only was the issue whether he had applied for a transfer wholly irrelevant to the purpose of the hearing and Trotter's testimony, Superior's strident efforts to classify Trotter's responses as lies under oath fail. As the ALJ and Board observed, the question could easily have been understood by Trotter as going to the matter of a formal, written application for transfer (which he never did) rather than to informal, oral requests that he be considered for transfer.

As for the reason given by Trotter for requesting a few hours of time off work on the morning of the hearing, there was at least substantial evidence that "personal business" or "personal matters" were explanations frequently given by Trotter and other Superior employees to — and deemed sufficient by — immediate supervisors. Nothing indicates the necessity for an employee, even a court security officer, to go into great detail about the reasons for wanting a few hours off, particularly when, as here, going into

5

greater detail would risk adverse reaction to otherwise protected activity.

Then there is the "charge" that Trotter disobeyed Heard's direct order to report on time, which is particularly revealing of Superior's animus. Even though Trotter's immediate superior, Officer Johnson, confirmed that the only thing he had told Trotter about reporting to work after time off on the morning of the initial hearing was that Trotter needed to report sufficiently ahead of his (Johnson's) 4:00 p.m. court date, Superior has endeavored to manufacture a reporting time of noon and then to make much over the time elapsed between Trotter's departure from the initial hearing to change into uniform and report for duty, which he did by approximately 1:30 p.m. What came through loud and clear to the ALJ — then subsequently to the NLRB, and now to us — is that Trotter's surprise appearance and pro-union testimony at the initial hearing touched off an immediate reaction by Heard to squelch Trotter's anti-union activities and (likely) terminate his employment. By telephone, Heard immediately set off a flurry of activity following the adjournment of the hearing and well before Trotter could possibly have made it back to his duty station, even if he had not gone home to change into his uniform. By the time Trotter reported, the Heard-initiated action had traveled directly down the chain of command so that, when Trotter arrived, Johnson referred him to Castillo, where the provocation discussed below commenced. We agree with the ALJ and the NLRB that Heard's admonition to Trotter as he left the meeting not to be late for

6

work — even if not the tension-breaking jest that Trotter perceived it to be — cannot be elevated to the level of a direct order of a remote superior to be at his duty station by 12:00 noon.

We also conclude that there is substantial evidence that the confrontation between Trotter and Castillo following Trotter's reporting to work, which encounter admittedly escalated to "heated," was orchestrated from higher up, intentionally provoked by Castillo, and eventually used by Superior as a pretext to mask its anti-union animus in taking the adverse employment actions against Trotter. Castillo twice made Trotter cool his heels for protracted periods while waiting to be seen. The ALJ determined, based in large part on credibility calls, that Castillo deliberately goaded Trotter to the point of heated words and profanity, after intentionally irritating him by making him wait; and that this was deliberate incitement. We cannot say that the credibility calls, factual testimony, and reasonable inferences drawn from substantial evidence do not support this conclusion of the ALJ and the NLRB under the applicable standard of review.

The proffered weapons charge, i.e., that Trotter's sidearm was "dirty" when, on Castillo's order, he turned it over, and that he was in possession of an excess number of rounds for that weapon, is neither consistent with nor violative of the provision of the contract between Superior and the General Services Administration ("GSA") that Superior cites in support of its rule-violation charge against Trotter. Even assuming that the cleanliness of the handgun was not up to the expected level of "spit and polish," such a

7

first-time infraction would fall into the category of the most minor of offenses, at most justifying an admonition to clean it and keep it clean.

Turning to the question of the number of cartridges that Trotter possessed, the applicable provision of the GSA contract or Guard Manual cited by Superior states:

> Each guard, entering on duty, including the uniform on-site shift supervisor(s) shall be issued twelve (12) rounds of 125 grain hollow point ammunition. Six (6) rounds shall be used as a firearm load with six (6) rounds carried in a cartridge case.

This is the sole basis of Superior's claim that Trotter's possession of an excess six cartridges — 18 rather than 12 — put Superior in violation of its contract with the GSA. We agree with the ALJ and the Board that, under no recognized method of contractual interpretation can this language be construed to impose a _limit_ on the maximum number of cartridges that a guard may possess while on duty. To the contrary, the plain wording of the provision is best construed as a _minimum_ ammunition requirement. Regardless of the best interpretation, however, what the insupportable charge against Trotter demonstrates beyond cavil is that Superior was grasping at straws to manufacture charges against Trotter as pretexts for the real basis of his termination — his pro-union activity and Superior's anti-union animus, which started at the top with Heard and promptly proceeded all the way down the chain of command. That is the conclusion of the NLRB based on the findings of the ALJ; and we cannot say that this conclusion is unreasonable or lacking in support from substantial evidence.

8

III.

In conclusion, for essentially the same reasons as those set forth in the writings of the ALJ and the NLRB, we grant that Board's application for enforcement of the Order filed October 21, 2003, and we order same enforced in full.

ENFORCEMENT ORDERED.